**UNITED STATES of America,**
**Plaintiff,**

v.

**2. Donald Leonard RIESTERER,**
**Defendant.**

**Criminal Case No. 15–cr–206–WJM–2**

United States District Court,
D. Colorado.

Filed 12/15/2016

---

Patricia W. Davies, Tonya Shotwell Andrews, U.S. Attorney's Office, Denver, CO, for Plaintiff.

Gary Lozow, Foster Graham Milstein & Calisher, LLP, Denver, CO, for Defendant.

## ORDER ON FINDINGS OF FACT REGARDING LOSS AND RESTITUTION

William J. Martínez, United States District Judge

Following an evidentiary hearing on December 1, 2016 (*see* ECF No. 181), the Court has reached findings of fact and conclusions of law in regards to the sentencing of this Defendant, as set forth below.

### I. PROCEDURAL BACKGROUND

Pursuant to a Plea Agreement, Defendant Donald Leonard Riesterer ("Defendant" or "Riesterer") pled guilty on August 3, 2016 (ECF No. 157) to a single-count Information for violation of 18 U.S.C. § 1343 (wire fraud) & 2 (aiding and abetting) (ECF No. 155).

Both in the Plea Agreement, and when the Court accepted Riesterer's plea, the parties identified certain factual disputes related to sentencing, primarily bearing on the calculation of restitution and the calculation of loss under the Sentencing Guidelines, U.S.S.G. § 2B1.1(b).[1] Accordingly, the Court scheduled an evidentiary hearing on "all disputed facts relevant to sentencing" (ECF Nos. 157, 171), which took place on December 1, 2016 (ECF No. 181). At the hearing, the Government called

three witnesses including FBI Special Agent Brian Blauser, and victims M.D. and S.W. In addition to testifying himself, Riesterer called three witnesses: Edward Luna, Antonio Blanco, and Amy Ramsey. Messrs. Luna and Blanco both worked with Riesterer on certain efforts related to the "CD monetization" portion of the fraud scheme, as described below. Ramsey was Riesterer's assistant or secretary.

### II. FINDINGS OF FACT

Initially, the parties agree that the elements of the offense to which Riesterer has pled guilty are: *first*, that Riesterer devised, intended to devise, or knowingly participated in a scheme as stated in the Information; *second*, that he acted with specific intent to defraud; *third*, that he transmitted something by means of wire communication in interstate commerce or caused another person to do so for the purpose of carrying out the scheme, and *fourth* that the scheme employed false or fraudulent pretenses, representations, promises, or omissions that were material. (ECF No. 158 at 4.)

The parties also agree and have stipulated that there is a factual basis for Riesterer's guilty plea, as set out in the Plea Agreement. (*Id.* at 5.)

1. The Court will apply the 2011 version of the Sentencing Guidelines and Manual.

Ordinarily, the Court applies the version of the Guidelines in effect at the time of sentencing, unless such application would violate the Constitution's *ex post facto* clause. *United States v. Sullivan*, 255 F.3d 1256, 1259 (10th Cir. 2001). "The *Ex Post Facto Clause* is violated if the court applies a guideline to an event occurring before its enactment, and the application of that guideline disadvantages the defendant 'by altering the definition of criminal conduct or increasing the punishment for the crime.'" *Id.*

Here, as set out in the Plea Agreement, the conduct for which Riesterer is being sentenced ended on or around January 25, 2012. (*See* ECF No. 158 at 18.) At that time, the 2011 version of the Sentencing Guidelines was in effect. However, later versions of the Guidelines would increase Riesterer's offense level if his crime "resulted in substantial financial hardship" to the victims. See U.S.S.G. § 2B1.1(b)(2) (2015). Application of that provision would in all likelihood increase Riesterer's punishment in this case. Accordingly, the Court applies the 2011 version of the Guidelines in order to avoid a potential *ex post facto* problem.

## A. Stipulated and Undisputed Facts:

The following findings of fact, principally drawn from the Plea Agreement, are stipulated or not in dispute. In some instances they reproduce facts and statements from uncontroverted documents in evidence or undisputed testimony,

### 1. Purported NRI Stock Investment Fraud

1. At all relevant times, Riesterer controlled two companies: Northwest Refining Inc. ("NRI"), and Northwest Financial Group, Inc. ("NFGI"). (*Id.* at 6.)

2. At all relevant times, Riesterer resided in Minnesota and Wisconsin. (*Id.*)

3. Beginning in 2000, NRI owned real estate in Roswell, New Mexico on which a metals processing plant was located (the "New Mexico plant"). (*Id.*)

4. The company associated with the New Mexico plant, NRI, was administratively dissolved by the Minnesota Secretary of State's Office in 2005 and remained dissolved until April 2010. (*Id.*)

5. In early 2010, Riesterer's co-defendant, Daniel Jay Bussema ("Bussema"), began promoting investments in NRI. (*Id.*)

6. Bussema provided prospective investors, including M.D., S.W., and C.B., with a "Confidential Limited Offering Memorandum," (the "Memorandum" or "Offering Memorandum"), which purported to offer shares of common stock in NRI to be sold for one dollar per share. (*Id.*)

7. Another individual, Jerry Shuman ("Shuman") was involved with Bussema in developing and promoting the Offering Memorandum. At the evidentiary hearing, Riesterer described Shuman as "a gentleman who I had invested a bunch of money with in New Mexico in the late 90s...96, 97, 98...as he was trying to get [the New Mexico] plant running." Several communications between Shuman and Bussema were introduced into evidence and demonstrate that beginning in approximately February 2010 Shuman was providing Bussema with information to include in the Offering Memorandum. (*See, e.g.,* Exs. A40–43, 45.)

8. The Memorandum stated that the shares to be offered were unregistered securities pursuant to Rule 504 of Regulation D under the Securities Act of 1933. (ECF No. 158 at 6.) The testimony and evidence at the hearing also established that individuals involved in this case commonly referred to this as "Reg D" and also referred to the Offering Memorandum by using this shorthand.

9. The Memorandum stated that NRI's "principal offices" were at the plant in New Mexico. (*Id.*).

10. The Memorandum identified Riesterer as the founder and an officer and director of NRI. (*Id.;* Ex. 4 at 65, 76; Ex. A47 at 9, 20.)

11. The Memorandum also identified Shuman as a company officer, along with Riesterer's secretary, Amy Ramsey ("Ramsey"). (Ex. 4 at 65, 76; Ex. A47 at 9, 20.)

12. The Memorandum asserted among other things, that "[t]he specialty of the company is in processing gold from ore," and that NRI was poised to develop "a more efficient and effective means of capturing a maximum amount of gold," and "plans to market their equipment and proven processes on a global basis within 2010." (ECF No. 158 at 6–7.) The parties stipulate that these claims were false. (*Id.* at 6–7.)

13. The Memorandum further stated that the proceeds generated by sales of shares would be deposited into an "Escrow Account with the Law Firm of [J.B.], Esq." (*Id.* at 7.) Further, the Memoran-

dum stated that when the proceeds reached $75,000, the money "will be released from the escrow account and utilized by the Company [NRI]." (*Id.*)

14. Shuman sent Riesterer a copy of the Offering Memorandum on February 11, 2010. (Ex. A47.)

15. In approximately March 2010, according to Riesterer, Shuman sent him an offer to purchase the New Mexico plant for $900,000. In addition to testifying about this attempted contract, Riesterer put into evidence a written contract offer evidently signed and transmitted by Shuman on or around March 8, 2010, but not executed by Riesterer. (Ex. A40.) Riesterer did not claim he ever completed such a contract and did not present evidence that he had done so.

16. A later addendum to the Memorandum promised investors a 15–to–1 investment return. Specifically, the addendum stated that NRI "has provided certain assurances regarding further security for shareholders," one of which involved a "Certificate of Deposit." The addendum explained that "the implementation of this instrument shall provide a means by which in the event that [NRI] is not successful in the endeavors set forth .... The Company ... shall authorize the monetization of said instrument and upon completion of this action will redeem shares purchased within this Offering. ... no later than October 1, 2010 .... The buyback redemption amount for investors will be $15.00 per share." (ECF No. 158 at 7–8; Ex. 4 at 85.)

17. As relevant here, three individuals (victims) invested. (ECF No. 158 at 8.)

18. The first victim was M.D., then a resident of Estes Park, Colorado. (*Id.*) M.D. had been introduced to Bussema in March 2010 by a friend, who went by the alias Celetha Ryos (a/k/a Celetha Ryan) ("Celetha"). (*Id.*)

19. After discussing the potential investment with Celetha and with Bussema, and having considered the Memorandum, M.D. invested initial sums in the purported NRI stock offering totaling $20,000 ($5,000 on March 26, 2010; $5,000 on April 1, 2010; and $10,000 on April 15, 2010). (*Id.*)

20. The above funds transferred by M.D. were sent to an account that Bussem a represented was an escrow account controlled by Attorney J.B., as described in the Offering Memorandum. (*Id.*)

21. S.W. and C.B. were both introduced to Bussema by M.D. and thereafter became victims in this case as additional "investors" in the purported NRI stock offering. (*Id at* 9.)

22. S.W., a Colorado resident, transferred $30,000 into the same purported escrow account to which M.D. had sent her funds: $15,000 on April 16, 2010 and another $15,000 on May 10, 2010. (*Id.* at 9.)

23. C.B., a Georgia resident, transferred $10,000 to the same purported escrow account on May 11, 2010. (*Id.* at 9, 18.)

24. In April 2010, M.D. learned through an Internet search that NRI had been administratively dissolved as a Minnesota business entity. She brought that fact to the attention of Celetha, who in turn informed Bussema. (*See id.* at 8.)

25. On April 14, 2010, Ramsey, Riesterer's assistant, acting at Riesterer's direction, undertook to have the company returned to good standing. (*Id.*) M.D. received a copy of the certificate of good standing and transferred her $10,000 investment the next day. (*Id.*)

26. On May 10, 2010, Riesterer transferred ownership of the New Mexico property to third party other than Shuman. Riesterer claims this sale was "conditional" or subject to some form of agreement that Riesterer and/or Shuman would "buy

back" the property following this sale. (*See, e.g.,* Ex. B58.) However, the transfer was accomplished by a warranty deed signed by Riesterer (and notarized by Ramsey) on May 10, 2010. (Ex. 30). On May 11, 2010, the buyer of the property completed the transaction by transferring $50,000 to a Riesterer-controlled bank account held in the name of NFGI ("NFGI Account"). (ECF No. 158 at 9.) There is no evidence that a "buy back" agreement was actually concluded or that Riesterer ever actually attempted to repurchase the property.

27. As of early May, 2010, M.D. was considering making another, larger "investment" in NRI stock. Before doing so, she wanted to speak to Riesterer, who she understood to be the owner of NRI. (*Id.* at 8.)

28. M.D. called Riesterer's office in the morning of May 11, 2010 and left a message. Riesterer returned her call later that day. M.D. was in Colorado, while Riesterer was in Wisconsin. (*Id.*)

29. The following facts are stipulated regarding the May 11, 2010 phone call:

a. At least one other person was on the line with Riesterer. (*Id.*) [2]

b. M.D. explained to Riesterer that she was considering a $100,000 stock purchase in NRI and wanted confirmation that, in offering NRI stock, Bussema was in fact acting on behalf of NRI. (*Id.*)

c. M.D. was told that about 100 tons of ore were at the New Mexico property and that after becoming operational, the New Mexico plant would produce almost pure gold. (*Id.* at 9.)

d. Riesterer did not tell M.D. that he had transferred the New Mexico property by way of a warranty deed the day before.

30. Believing what Riesterer had said on the May 11, 2010 call, and unaware that ownership of the New Mexico property had been transferred by NRI the day before, M.D. made her additional "investment," transferring an additional $100,000 to the purported escrow account on May 13, 2010. (*Id.* at 9.)

31. No one informed S.W. or C.B. of the May 10, 2010 transfer of ownership of the New Mexico property by NRI. (*Id.* at 9.)

32. In total, M.D., S.W., and C.B. sent a total of $160,000 to the purported escrow account. (*Id.* at 10.) Of that total, $60,000 was sent on or before May 11, 2010 (the day of the phone call between Riesterer and M.D.) and $100,000 was sent after that date by M.D. (The amounts and dates of these transfers are reflected on lines 1–7 of the Government's Exhibit 1.)

33. The account to which M.D., S.W., and C.B. transferred funds was not an escrow account. J.B., the attorney identified in the Memorandum as controlling the account, actually had no affiliation with it. (ECF No. 158 at 10.)

34. The purported escrow account had in fact been opened by Bussema at a bank in Michigan on March 25, 2010 (one day before the first "investment"), in the name of NRI. (*Id.* at 10.)

35. M.D., S.W., and C.B. received no earnings on the "investments" that they transferred to the "escrow account" in connection with the purported NRI stock of-

---

2. The Plea Agreement stipulated that there were "one or two" other people on the line. At the hearing, M.D. testified that Riesterer told her there were "several other people" on the line and remembered there being three other individuals, one of whom was Shuman. Riesterer argues that Shuman was the only other person on the line. This dispute is not ultimately material to resolution of the issues before the Court.

fering. The principal amount of these "investments" was never returned. (*Id.*)

36. Bussema transferred $16,500 of the monies he received from M.D., S.W., and C.B. to "Celetha" as a commission. (*Id.*)

37. Following demands by Riesterer, Bussema transferred a total of $28,000 of the monies received from M.D., S.W., and C.B. to a bank account controlled by Riesterer in the name of NFGI, including $3,000 sent May 28, 2010 and $25,000 sent June 16, 2010. (*Id.*)

38. Bussema used the remaining funds transferred by the three "investors" for his own personal purposes. (*Id.*)

39. Neither Riesterer nor Bussema used any of the monies transferred by the three "investors" as represented in the Offering Memorandum. (*Id.*)

40. None of the monies transferred by the three "investors" were used as promised on the May 11, 2010 telephone conversation with M.D. (*Id.*)

41. Neither Riesterer nor Bussema used the monies transferred by the three "investors" to further NRI's business. (*Id.*)

42. Riesterer used the $28,000 transferred by M.D., S.W., and C.B. in response to the NRI Offering Memorandum to pay bills, re-pay personal debts, send money to his ex-wife, pay his assistant (Ramsey), buy gasoline, pay for meals, and for other personal expenses. (*Id.*) Put another way, Riesterer did not return the money he received from Bussema to M.D., S.W., or C.B.

43. At the evidentiary hearing, the Government presented evidence through Special Agent Blauser that Bank records show a total of approximately $110,000 moved from Bussema to Riesterer beginning in May 2010 and continuing through 2012. Bussema also informed the FBI that he delivered an additional $10,000 to Riesterer in cash. Riesterer did not contest these facts and the Court accepts them as proven.

44. On June 10, 2010, Riesterer e-mailed Bussema stating, *inter alia*, "If I do not hear from you first thing tomorrow morning, I will take steps to find out what is really going on with my Reg. D. this is complete BS and unprofessional as all hell. The agreement I have signed with you says after the first 75k we have access to the cash." It further stated "Now you don't answer my calls, or texts? ?" (Ex. 27.)

2. Stipulated and Undisputed Facts Regarding "CD Monetization" Fraud

45. Riesterer also told M.D. that his other company, NFGI, had a $500 million Chase Manhattan Bank certificate of deposit, the beneficiary of which was a pension fund in Argentina. (ECF No. 158 at 10–11.)

46. The supposed Argentinian pension fund was allegedly represented by an individual known as Roberto Kling ("Kling"). (*Id.* at 11.)

47. Riesterer eventually produced three versions of the purported certificate of deposit to M.D. and C.B. Each of the three was a single page marked "International Certificate of Deposit." Each stated that it was from "Chase Manhattan Bank" and that the "depositor's name" was "Northwest Financial Group, Inc." The first certificate said its "date of issue" was January 22, 2009, the second said July 31, 2009, and the third July 8, 2010. The first and second versions of the certificate of deposit each said that the "Principal Amount" was $500 million, while the third version listed an amount of $558 million. (*Id.*)

48. In fact, Chase Manhattan Bank had not issued any of the purported certificates of deposit. Indeed, Chase Manhattan Bank

*did not exist* as of the 2009–2010 dates listed on certificate(s) of deposit, but had become JP Morgan Chase Bank in 2001. (*Id.*)

49. The parties also agree that Kling did not actually represent the entities with which he claimed affiliation. Riesterer takes the position that Kling was "the true fraudster in this case," and also now acknowledges that Kling had been convicted of a federal felony in Florida in the early 1990s. (ECF No. 175–1 at 9, 10.)

50. From Riesterer's evidence, it appears he first contacted Kling in January 2009. (*See* Ex. B43 (Jan. 5, 2009 e-mail from Riesterer to Kling: "I would like to borrow [$]5,000,000 from you for a check cashing operation in California.").)

51. Riesterer then recruited a bilingual friend and business associate, Edward Luna, to assist him in dealing with Kling, as Mr. Luna described at the hearing.

52. Riesterer, or Luna acting on his behalf, commissioned a background investigation or report on Kling. On January 8, 2009, Luna received a copy of this report (Exs. 25 & 26.) The report contained the following information regarding Kling:

a. As to Mr. Kling's identified address, he "ha[d] not lived there for the past four (4) years, and it was not possible to determine a real residence in the Republic of Argentina for Mr. Kling." (Ex. 26 at 2.)

b. As to a foundation and credit union that Kling claimed to head, the investigation could not confirm their existence. Regarding several *possible* matches in official records the report stated "it cannot be determined if there is a relationship with Mr. Kling with any of these organizations from the official registries." (*Id.* at 3.)

c. As to the address given for the alleged foundation and credit union: "It is not possible for a foundation to function there, or a credit union[.]" (*Id.* at 2.)

d. "[Kling's] business history indicates unpaid debts . . ." (*Id.* at 4.)

e. "He does not have any bank accounts or credit cards in his name." (*Id.*)

f. In investigating another identified business address, "It was not possible to obtain any information regarding Mr. Kling." (*Id.*)

g. The report identified three prior lawsuits for debts, one that resulted in Kling being ordered not to leave the country. (*Id.*)

h. The report also identified a criminal history for Kling including arrest for "repeated fraud," another arrest for "penal code falsification of documents," and an entry for "Detention—(Resisting Arrest) . . . Fraud Use of a False Private Document in Formal Setting with Litigation Fraud Intent." (*Id.* at 5.)

53. Thereafter, Riesterer and Luna traveled to Argentina to meet Kling. Luna described this trip in his testimony. Among other things, he testified that they saw the "original" of the certificate of deposit in Argentina, noting it was on "yellowish . . . old looking paper."

54. Beginning in January 2009, documents submitted by Riesterer reflect that he, Luna, and/or his company NFGI or other Riesterer companies contemplated and/or entered into one or more contractual agreements with Kling or within companies affiliated with Kling. (*See, e.g.* Exs. B44, B47.) One of these, dated February 9, 2009, states that Riesterer and Luna "wish to form a business relationship in order to

perpetuate the creation of financial instruments." (Ex. B47.)

55. One copy of the alleged certificate of deposit put into evidence by Riesterer was evidently transmitted to him or to NFGI on or around January 22, 2009, accompanied by an "affidavit" from a Kling associate (Norge Dagotto). The affidavit leads, in bold face type, with the subject line: "Re: Not a STING operation," and further declares that "the Bank Financial Instrument ... will be of an authentic nature," and that Dagotto and Kling "are no[t] agents of the US Government, nor of any investigative organization, and certify that this transaction is not in any way a part of sting operation instituted by any government authority, or organization of the US Government, no[r] any other world governmental body." (Ex. B45.) Riesterer admitted this document into evidence with no explanation of why such Nixonian reassurances were offered in connection with the certificate of deposit, within weeks of his first contact with Kling.

56. On January 29, 2010, Riesterer received an e-mail from a company called Selective Properties, LLC with which he had evidently made inquiries regarding the certificate of deposit. Among other issues raised in this email, the sender asked "Chase Manhattan is now JP Morgan Chase .... Why is this document on CHASE MANHATTAN documents?" and noted that the CUSIP number shown on the certificate of deposit "is not registered with the CUSIP Service Bureau." (Ex. B46.) Riesterer did not introduce evidence showing any response to this e-mail or its inquiries.

57. Riesterer misrepresented to M.D. that the certificate of deposit could generate money through a process Riesterer referred to as "monetization." (ECF No. 158 at 11.)

58. Riesterer misrepresented to M.D. and J.B. that before "monetization" of the purported certificate of deposit could begin, an insurance bond, or "wrap" had to be purchased. (*Id.*)

59. J.B. agreed to provide money to buy the alleged insurance bond or "wrap," and sent $60,000 to the NFGI bank account on July 12, 2010. (*Id.*)

60. M.D. told S.W. and C.B. what Riesterer had said about the purported certificate of deposit and the need for an insurance bond or "wrap," and Riesterer's claim that he could use the certificate of deposit to refund their NRI "investments." (*Id.*)

61. Relying on the information from Riesterer, C.B. transferred $40,000 to NFGI on July 23, 2010 for the purchase of an insurance bond. M.D. contributed half of this $40,000. (*Id.* at 12.)

62. Riesterer did not inform either M.D. or C.B. of the $60,000 he had received from J.B. on July 12, 2010 for the alleged insurance bond/"wrap". (*Id.*)

63. Riesterer likewise did not inform J.B. of the $40,000 he received from M.D. and C.B. on July 23, 2010 for the alleged insurance bond/"wrap". (*Id.*)

64. Riesterer used none of the money he received from J.B., C.B., and M.D. to purchase an insurance bond. Instead, he sent half of the money to Kling, and used the remainder to make payments to his ex-wife, and for other purposes unrelated to an insurance bond. An insurance bond was never purchased. (*Id.*)

65. Riesterer purported to put up a house in Saint Paul, Minnesota as collateral to guarantee his repayment of the monies received from J.B., C.B. and M.D. related to the insurance bond/"wrap." (*Id.*) He did not inform C.B. or M.D. that he had offered the house as security for J.B.'s payment, and he did not tell J.B. that he had done the same for C.B. and M.D.

Riesterer promised J.B. he would mortgage the property for J.B.'s benefit, but never did so. (*Id.*)

66. Riesterer did not personally own the house in Saint Paul, and it was not titled in his name. (*Id.*)

67. In August 2010, Riesterer asked J.B. for more money, misrepresenting that he needed it because of an increase in the cost of the insurance bond. J.B. responded by sending $5,000 to Riesterer for that purpose on August 11, 2010. Riesterer again did not use this money for an insurance bond or any purpose related to "monetizing" the certificate of deposit. Rather, he used it for personal purposes, including payment of $4,000 to his ex-wife. (*Id.* at 12–13.)

68. From August 2010 through 2012, Riesterer made a series of false statements to M.D., C.B., S.W., and J.B., and provided fraudulent documents to them. These statements and documents included representations that Riesterer was engaged in efforts to generate funds through "monetization" of one or more of the purported certificates of deposit. (*Id.* at 13.)

69. Riesterer's false statements included false representations that Kling was in the United States assisting with the effort to "monetize" the certificate of deposit. (*Id.*) These are detailed in the plea agreement. (*Id.* at 13–14.) Those stipulated facts are adopted in full although not reproduced here. In summary, they include statements such as, in January 2010, "Roberto will be in NY tomorrow and I will be meeting him on Thursday"; in February 2012, Kling "will be arriving on Monday night" and "I am still with Roberto tonight," and in March 2012, "Roberto is still here," claiming they were "working very hard spending huge dollars on legal to push this through." (*Id.*)

70. Riesterer's representations that Kling was in the United States were false, and Riesterer knew they were false. Kling has not entered the United States since at least February 2007, when the State Department had denied his visa application. (*Id.* at 14.)

71. Riesterer also made false statements regarding the Federal Reserve Bank of Minneapolis ("Fed") and its supposed role in facilitating the receipt of money from "monetizing" the purported certificate of deposit. These are detailed in the plea agreement (ECF No. 158 at 14–15) and those stipulated f acts are adopted in full although not reproduced here. In summary, Riesterer claimed that a Fed employee named Marc Graham was assisting him and traveling with him as he tried to get the certificate of deposit "monetized," and that the Fed was opening a special account to facilitate the receipt of funds. These representations were false. No agent of the Fed prepared an account for Riesterer or NFGIFI; there was no individual by the name of Marc Graham who worked for the Fed; and Riesterer was not at the Fed when he represented that he was in meetings there. (*Id.*)

72. Beginning in August 2010 and continuing into 2012, Riesterer sent a series of other e-mails to M.D., C.B., S.W., and J.B., misrepresenting that he was traveling to various cities in Europe and meeting with bankers and government officials there as part of his efforts to "monetize" one of the purported certificates of deposit. These emails were all false—rather than being in Europe as he represented, Riesterer actually sent these e-mails from Minnesota or Wisconsin. Examples of these misrepresentations are stipulated in detail in the Plea Agreement. (*See* ECF No. 158 at 15–17.) The Court adopts those stipulated f acts in full, without reproducing them all here.

73. In summary, Riesterer repeatedly misrepresented to M.D., S.W., and J.B., that he was in Europe for meetings with bankers or government officials (*e.g.*, "we are now working with the Banks here in Zurich"; "I am in nonstop meetings, and running all over Hannover"; "Hello from Frankfurt ...."), when he was actually in Wisconsin or Minnesota. He repeatedly mis-represented such promises as "We will begin moving money ASAP!!", "[W]e will be underway on the First [of March 2011]", "[E]veryone is moving quickly to finish our deal," "[N]othing bad is happening, and this will close, and we will get money very soon"; and "I know with full certainty that we will have good money on the 10th [of September 2010]." Finally, he repeatedly asked M.D. and/or S.W. for more money to support his travel and expenses. (*See id.* at 15–17.)

74. As a result of Riesterer's misrepresentations regarding his efforts to "monetize" the alleged Chase Manhattan Bank certicate(s) of deposit, and his implication that this "deal" would be seriously compromised if they did not send more money, S.W. and M.D. gave Riesterer a total of $114,500 between October 13, 2010 and January 25, 2012. The dates and amounts of these transfers are stipulated in the Plea Agreement (ECF No. 158 at 18) and set out in the Government's Exhibit 1 (lines 12–30), and Riesterer does not dispute these facts.

## B. Disputed Facts & Additional Findings of Fact

### 1. Burden of Proof

The issues before the Court are the amount of loss and the amount of restitution attributable to this Defendant. "The government bears the burden of proving loss by a preponderance of the evidence." *United States v. Schild*, 269 F.3d 1198, 1200 (10th Cir. 2001). Likewise, "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664. In other words, the Government must show it is more likely than not that the factual matters on which it bears the burden are true. *See, e.g., United States v. Craig*, 808 F.3d 1249, 1257 n.7 (10th Cir. 2015).

### 2. Credibility Determinations

The Court's findings turn in significant part on the witnesses' credibility, including their demeanor while testifying, particularly because Riesterer's testimony was directly contrary to certain of the Government's factual contentions. It is therefore appropriate to make explicit the Court's credibility determinations following observation of the witnesses' testimony and demeanor during the day-long evidentiary hearing, and attempting to reconcile that testimony with the stipulated facts and documentary evidence.

#### i. *M.D. and S.W.*

The Court found no reason to doubt the credibility of M.D. or S.W. Their answers were straightforward, logical, and sincere, without undue embellishment. Their testimony was also consistent with both the substance and demeanor of their prior statements before the undersigned in connection with the sentencing of co-Defendant Bussema, and with their documented prior statements, including to the FBI. The Court credits their testimony as highly credible and reliable.

In addition, M.D. in many instances kept contemporaneous notes of her conversations with Riesterer and/or sent e-mails documenting those conversations shortly

after they occurred. Those records were made before any court proceedings were contemplated. The fact that the testimony from S.W. and M.D. was consistent with M.D.'s contemporaneously-created records further, and significantly, bolstered their credibility.

#### ii. Blauser

The Court had no reason to doubt the credibility of Special Agent Blauser.

#### iii. Riesterer

In contrast, the Court found Riesterer substantially less credible. Although his testimony was brief, several of his factual statements, while offered emphatically, were not at all credible. In the first place, Riesterer has already admitted to dishonest conduct in this case. In addition, the following discussion both resolves specific factual disputes and illustrates the Court's overall conclusion that his testimony was not credible or convincing.

#### (1) Riesterer's Receipt of Memorandum in February 2010

Riesterer testified that although he now remembers Shuman sending him the Memorandum in February 2010, he "never even looked at it", did not authorize it, and was unaware of its existence prior to his May 2010 phone call with M.D. His explanation was that Shuman frequently sent "similar" documents, so he ignored it. For a number of reasons, this testimony is very difficult to believe. Initially, the Memorandum sent by Shuman purported to sell $1 million worth of stock in Riesterer's own company, NRI. It repeatedly mentioned Riesterer by name and included his résumé. On its face, it sought to raise funds for the same New Mexico plant on which Riesterer testified he had already invested over $800,000, working with Shuman. In short, given its contents and representations, it defies belief that this was a type of document Riesterer would just simply ignore; he had every reason to carefully review this document and to object if it were in fact unauthorized.

Riesterer's explanation that Shuman sent many "similar documents" was not corroborated by other evidence, such as records showing that Shuman really did, with any regularity, send Riesterer unauthorized stock offerings for his companies. Nor was there corroborating evidence that Riesterer typically ignored communications from Shuman, or any documentary evidence showing that Riesterer ever disclaimed the Memorandum. Riesterer offered no explanation for how he had been fully aware of Shuman's March 2010 offer to purchase the New Mexico plant for $900,00 but totally unaware of the February 2010 e-mail and Memorandum regarding the same property. Even after Riesterer admits having learned that Bussema had "used [the] Reg D to steal" in NRI's name (as phrased by Riesterer's own counsel), there is no record of communication from Riesterer to Bussema or Shuman to corroborate his claim of total ignorance prior to May 2010. If the Memorandum was a total surprise, the Court is left to wonder: Why did he not promptly send something approximating a "cease and desist" request to these individuals? Moreover, how did he know to include Shuman on the May 11, 2010 phone call? Why did he not, on that call, articulate any surprise to learn of the purported stock offering? The lack of logical answers to these questions strongly suggests Riesterer was aware of the stock offering prior to the May 11, 2010 phone call.

Furthermore, the contents of the e-mail makes it highly improbable that Riesterer did not at least open the Memorandum in February 2010. The e-mail states only "Please see attached for your review," attaching a file named "NORTHWEST_RE-FINING_REG_ D_FINAL_ 20101102.-

pdf." Given this cryptic title, Riesterer could not have known the Memorandum was "similar" to anything else sent to him by Shuman without in fact first opening it. At the same time, the file name itself indicated it was a proposed "Reg D" stock offering for NRI—something surely worthy of Riesterer's attention. And, Riesterer did need not to read past the first lines to see (in oversized, bold-faced type) that the Memorandum claimed to be selling $1 million worth of NRI stock.

Finally, Riesterer's own actions and communications are consistent with the interpretation of the facts that he was aware of the purported stock offering prior to May 11, 2010. His e-mail to Bussema on June 10, 2010 indicates that he was aware of the Memorandum's existence and its terms. *Compare* Ex. 27 (Riesterer inquiring about Bussema on June 10, 2010 regarding "what is really going on with my Reg. D" and stating "the agreement I have signed with you says after the first 75k we have access to the cash") *with* Ex. A47 at 2, ¶ 1 (February 2010 Offering Memo including term that "Upon the sale of $75,000 of Shares, all proceeds will be delivered directly to the Company's corporate account . . . ."). W hen Riesterer learned that M.D. had called regarding NRI, he knew to reach out to Shuman before returning her call. (*See* Ex. B11). Despite having allegedly rejected an offer to sell the New Mexico plant to Shuman for $900,000 in March 2010, he then sold it to someone else for $50,000, the very day before the call, receiving payment the day of the call. Yet Riesterer failed to inform M.D. of any of these facts. And, he had recently directed his secretary to update NRI's corporate status, within days of M.D. alerting Celetha of this problem.

Given these facts, the Court concludes that it is more likely than not that Riesterer was already aware of dubious schemes involving the New Mexico plant, and was aware of the purported NRI stock offering prior to May 11, 2010, and it is more likely than not that he had reviewed the Offering Memorandum sent to him in February 2010. The Court found Riesterer's claims to the contrary not credible and they are rejected by the Court.

(2) Riesterer's Purported Trust in Kling

Riesterer testified, emphatically but with little explanation of *why*, that he trusted Kling and followed his orders:

Q. The position you're taking . . . were you following Kling's orders fairly wholesale in terms of when he told you to do things, you did it?

A. Of course.

Q. Why?

A. I believed him.

A careful review of the evidence in the record reveals numerous outsized "red flags" regarding Kling and the certificate(s) of deposit that were known to Riesterer as early as 2009, as detailed in the findings of fact above. (*See supra* ¶¶ 48–50, 52, 55–56.) This is also further highlighted by the testimony of Messrs. Luna and Blanco, addressed below. Given this evidence, Riesterer's unexplained assertion that he simply "believed" Kling and therefore followed his "orders" in "wholesale" fashion was also not credible to the Court.

(3) Riesterer Signaling to Other Witnesses

During Mr. Blanco's testimony in court under oath, the undersigned personally observed Riesterer deliberately attempting to signal some type of communication or information to Blanco. When the Court instructed Riesterer to immediately stop any further signaling, neither Riesterer nor his counsel offered any explanation that this conduct was anything other than a deliberate attempt to influence the testimony of the witness on the stand. This

demonstrated willingness to interfere with the sworn testimony of another witness casts further doubt on the veracity of Riesterer's own testimony, his credibility as a witness, and the integrity of his written and oral communications in this case.

### iv. Luna and Blanco

Without addressing the veracity or sincerity of the testimony from Messrs. Luna and Blanco, their testimony hurt Riesterer more than it helped him. In short, both testified that they had been recruited by Riesterer to assist him in "monetizing" the Kling CD. They testified that they believed the purported CD was legitimate, and that they observed or understood that Riesterer sincerely believed it was legitimate. However, as analyzed below, whether or not Riesterer had a "good faith" belief in this scheme has little bearing on the material issue before the court, which is whether the loss caused by Riesterer's confessed fraud was reasonably foreseeable.

In addition, Luna conceded that his investigation of the alleged certificate(s) of deposit failed to reveal the widely-publicized fact that Chase Manhattan Bank no longer existed as of the CD's alleged issuance in 2009. In Luna's narrative of traveling with Riesterer to meet Kling in Argentina, sports cars and armed escorts featured more prominently than banks or business meetings ("they had a leader car ... with guys and guns, all kind[s] of cool stuff").

Likewise, Blanco conceded that although he knew Chase Manhattan Bank had ceased to exist, he nevertheless believed this "certificate of deposit" bearing a New York address was a legitimate financial instrument issued by a "Chase Manhattan Bank" entity in the British West Indies. After testifying extensively about the "gray screen" system at the center of his plans to verify and "monetize" the CD,

Blanco acknowledged that he "cannot guarantee you that it [the "gray screen"] exists or not because I have never been able to see it," and that legitimate banks will "laugh at you" if you inquire about it. As to Kling, Blanco never met him in person, but testified that "at no time I had any doubts that [he] was trying to help the people in the foundation ... [because] Mr. Kling had, you know something to do with ... Israeli secret police or whatever ... something like that."

In sum, rather than supporting Riesterer's claim of a good faith belief in the legitimacy of the Kling/CD scheme, this testimony by Luna and Blanco reflected that Riesterer's dealings with Kling and regarding the certificate of deposit always had the trappings of a scam or illegitimate venture, tinged with criminality and conspiracy theories. In this sense, Luna and Blanco's claims and testimony were not credible, and this in turn leads to the conclusion that it was more likely than not that Riesterer was either directly a party to the fraud involved in this scheme or, at the very least, unreasonably ignored obvious warning signs that the scheme was fraudulent.

### v. Ramsey

Ms. Ramsey's testimony was also not very helpful in resolving the disputed issues. Although her assertion that she had never heard of or communicated with Bussema prior to taking M.D.'s call and message on May 11, 2010 had some support, Ramsey's own credibility was undermined by her admissions that she was also implicated in at least some aspects of Riesterer's financial misdeeds, including admitting that both she and Riesterer used the NFGI bank account (the account to which a substantial amount of the monies at issue in this case were transferred) for their own personal debts and other purposes.

### 3. Additional Facts Regarding May 11, 2010 Call

M.D. took notes of the May 11, 2010 call. As she explained in her testimony, she typed her notes and then e-mailed them to C.B. She also sent a copy of these notes to the FBI in February 2013 and testified that she reviewed them and confirmed their accuracy and consistency with her memory at that time.

M.D.'s contemporaneous notes strongly corroborate her testimony regarding the call, emphasizing that the primary reason she called Riesterer was to confirm Bussema was working with NRI, and that Riesterer did, in fact confirm that he was working with Bussema:

> I ... called Don Riesterer's office in MN around 9:30 am asking for confirmation that he return my call *to confirm that he was working with Dan Bussema.* I got a call back later in the day including Don, Dan (I though[t] Dan Bussema, but turned out this was a different Dan) and Jerry [Shuman] on the call. I explained that I was just trying to do appropriate due diligence on this stock offering and *mainly wanted confirmation that NW Refining was involved in a 504 stock offering put together by Dan. Don and Jerry did verbally confirm that* and provided some additional information about the plant, their business and why they are anxious to get the plant online ASAP.
>
> * * *
>
> Don also said that once they get their money, they will be able to get the plant going in 60–90 days.
>
> I didn't really have any substantive questions to ask because *my primary objective was just to confirm that NW Refining was working with Dan Bussema.*
>
> * * *

> Anyway, *I explained to Dan that my ONLY objective in calling Don was to hear from him that NW Refining was indeed working with him (Dan).* I also told him that I had understood that he was on the call with Don and Jerry, because Don had introduced a "Dan". He said it wasn't him.

(Ex. 2 (emphasis added).)

Riesterer did not deny that he participated in the May 11, 2010 call. He stipulates that *someone* on that call made the claims regarding NRI's gold refining plant to M.D. He did not deny that *someone* on the call told M.D. that Bussema's stock offering was being made on behalf of and/or in concert NRI.

M.D.'s testimony was very specific and credible that it was Riesterer who told her he was working with Bussema. The Court credits that testimony and concludes the Government has proved by a preponderance of the evidence that Riesterer told M.D. on May 11, 2010 that he was working with Bussema on the NRI stock offering.

Moreover, even if the Court were to credit Riesterer's contention that Shuman made most of the substantive statements regarding NRI on the May 11 call, at a minimum, it is clear that Riesterer listened to these misrepresentations and did nothing to disclaim, deny, or correct any of these statements. And, it was Riesterer who chose to include Shuman on this call after receiving a message indicating only M.D.'s name and number, that the call was regarding NRI, and was made "on behalf of" Bussema. These facts do not support Riesterer's claim that he was an unwitting and blameless participant with no prior knowledge of the context for M.D.'s call.

### 4. Additional Findings of Fact Regarding NRI Investment Fraud Scheme

Given the evidence, the Court concludes that the following additional findings of

fact have been proven by a preponderance of the evidence:

75.[3] Riesterer was already aware of the NRI stock offering scheme prior to May 11, 2010.[4]

76. Riesterer told M.D. on the May 11, 2010 call that he and/or NRI were working with Bussema on the stock offering.

77. Riesterer either made mis-statements regarding the New Mexico plant to M.D. on this call or, through his omission, knowingly allowed those misrepresentations to be made.

78. Riesterer likewise made or knowingly allowed mis-statements to M.D. on this call representing that NRI was debt free and without liens.

79. Riesterer also made, or through omission knowingly allowed, misrepresentations to M.D. regarding the scope and prospects of the New Mexico plant's gold refining.

80. Riesterer's statements and/or omissions on the May 11, 2010 call led directly to M.D.'s decision to "invest" an additional $100,000, transferred on May 13, 2010. (*See* Ex. 1, line 7.) The Court bases this conclusion on the credibility of M.D.'s testimony, her contemporaneous notes regarding the purpose and content of the call, as quoted above, and her testimony that the May 11, 2010 call was "the main reason" that she sent an additional

$100,000 that she did so "specifically because of that conversation." The testimony and evidence at the hearing corroborated that although M.D. had withdrawn these funds from a retirement account some days prior, she committed to sending them *because of* Riesterer's statements and/or omissions on May 11, 2010.

81. Riesterer's conduct before, during, and after the May 11, 2010 call makes it more likely than not that he had already been involved in the purported NRI stock offering.

82. The falsity of the misrepresentations made to M.D. on May 11, 2010 was known or should have been obvious to Riesterer and thus his misrepresentations and/or omissions were made knowingly.

### 5. Additional Findings of Fact Regarding "CD Monetization" Fraud

83. Riesterer did not disclose to any of the victims any of the facts he learned during his background investigation of Kling, including the inability to corroborate basic information about Kling (*e.g.*, his address, residency, bank status, or affiliation with any of the entities he claimed to represent). Riesterer also failed to disclose to any of the victims the important information of which he had been previously apprised regarding Kling's identified crim-

---

3. For ease of any future reference or briefing, the Court numbers its enumerated findings of fact sequentially, despite the intervening analysis underlying these additional findings of fact.

4. This finding is also consistent with the stipulation entered between Bussema and the Government that "[b]etween March 2010 and July 2010, Mr. Bussema, *with assistance from* ... *Riesterer*, solicited monies from investors." (ECF No. 57 at 6 (emphasis added).)

 As related by Special Agent Blauser in his hearing testimony, Bussema's statements to

the FBI indicated that Riesterer had input throughout the process of drafting the Offering Memorandum. Blauser also reported that Bussema told the FBI that Riesterer had approved the 15–to–1 buyback provision, stating "just get the money any way you can, I don't care what you have to say." While these out of court statements weigh less heavily in the Court's findings of fact than other evidence, they are consistent with and therefore further support the Court's findings as to Riesterer's involvement in the NRI investment fraud.

inal history, including past cases involving fraud and falsification of documents.

84. Riesterer, as established by documentary evidence and the testimony of Ramsey, was aware that Chase Manhattan Bank had ceased to exist prior to the purported 2009 issuance date(s) of the certificate(s) of deposit.

85. As established by her testimony, Ramsey learned that the New York address listed on the purported certificate(s) of deposit was not actually a Chase Manhattan Bank address. She informed Riesterer of this fact, most likely in 2010.

86. The preponderance of the evidence shows that Riesterer, more likely than not, knew the certificate(s) of deposit was/were not the legitimate document(s) that he held it/them out to be in communications with the victims in this case.

87. The preponderance of the evidence shows that, more likely than not, Riesterer knew that the claimed or attempted "monetization" of the certificate(s) of deposit was not a legitimate business pursuit.[5]

88. Riesterer was aware that the money he received from J.B., C.B., and M.D. to purchase the insurance bond or "wrap" was not used for that purpose, given that he spent a large portion of this money on his own personal debts and expenses. Given the timing and circumstances in which Riesterer solicited and then spent this money, the Court concludes it is more likely than not that he never intended to use it for the purpose he represented, purchasing an insurance bond or "wrap."

89. Riesterer was aware that the money sent to him for alleged travel and living expenses in support of his "monetization" efforts was not used for the purposes represented, as in many cases he was not actually traveling as he had represented to the victims. Given the timing and circumstances in which he solicited and then spent this money, the Court concludes it is more likely than not that Riesterer never intended to use it for the purposes he represented.

### 6. Additional Facts Regarding Case Investigation

90. In approximately August 2012, S.W. and M.D. prepared and filed a complaint regarding the NRI investment fraud with the Colorado Division of Securities. The

---

**5.** Regarding this finding, Riesterer submitted affidavits from several non-testifying individuals to support his claim that he sincerely believed in Kling and in the CD monetization scheme, and to indicate that Kling also defrauded other individuals, indicating Riesterer was not the only one who believed in Kling. (Exs. B59, B62.)

The Court gives these submissions little weight. They do not actually contradict the relevant facts and evidence before the Court, and as analyzed below, whether Riesterer believed Kling in "good faith" is not relevant to the relevant determination of loss. The affidavits do not un-do Riesterer's stipulations and guilty plea as to the fraud he committed. The affidavits themselves are also too vague to shed any real light on Riesterer's own conduct or what was known to him, as opposed to what was known or believed by the affi-

ants. (*See, e.g.,* Ex. B59 ¶ 5 (affiant claiming "[an unidentified] person who I know well went to Argentina to investigate [Kling's] fund and concluded it was legitimate"); Ex. B62 ¶¶ 8, 10–11 (affiant stating—as the victims in this case no doubt also once believed—that Riesterer truly believed Kling's scheme was legitimate, apparently because he understood that Riesterer "was traveling outside the United States and was committed to finishing his effort" and told the affiant "many times he thought he was close to finishing the project").)

Riesterer's evidence indicating that he and others sent money to Kling at various times is similarly unilluminating without some evidence establishing the facts surrounding those payments, particularly regarding why Riesterer sent money to Kling and what Riesterer knew or intended at the time.

documentation compiled for this complaint was introduced in evidence here and also made part of the FBI's later investigation in this case. (Ex. 4.)

91. By August 2012, S.W. had retained an attorney who sent a demand letter to Bussema on August 20, 2012, threatening civil litigation for fraud and related claims. (Ex. 12.)

92. On October 4, 2012, after being contacted by M.D. and S.W., the FBI commenced the investigation that led to this criminal case, as Special Agent Blauser testified.

93. By September 2012, Riesterer was aware of S.W.'s demands and the potential for criminal action. Specifically, on September 14, 2012, he e-mailed Bussema regarding settling with S.W., stating "we have to get rid of [S.W.]," and relating he had told non-party individuals "just get me the money and I will pay her off." (Ex. 13.) On October 9, 2012, he e-mailed Bussema "You need to get the money to get rid of [S.W.] . . . her lawyers are pushing the whole Fraud thing again today. . . . Without the 30k today . . . this thing is going to go criminal this week." (Ex. 14.) By February 14, 2013, Riesterer had retained a criminal defense attorney. (Ex. 16.)

94. Riesterer began re-paying monies to M.D., S.W., C.B., and J.B. on March 3, 2013. His repayments to date total $189,500, as set out by date, amount, and recipient in Exhibit 20. (Ex. 20.)

## III. ANALYSIS

### A. Loss

Under the Guidelines, Section 2B1.1(b) "increases a defendant's base offense level for fraud according to the amount of the loss. The court is instructed to use the greater of actual or intended loss." *United States v. Crowe*, 735 F.3d 1229, 1236 (10th Cir. 2013) (internal quotation marks omitted; citing U.S.S.G. § 2B1.1 comment n. 3(A)). Here, the Government does not contend that intended loss w as greater amount than actual loss, so only actual loss is at issue. Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment n. 3.(A)(i).

Riesterer's argument focuses on the claim that he, at times, acted in good faith and did not "purposefully s[eek] to inflict" the loss to his victims. (*See* ECF No. 75 at 3 (quoting *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011).) That claim is largely beside the point, as it would only bear on the calculation of "intended loss," which is not at issue here. *Compare* U.S.S.G. § 2B1.1 comment n.3.(A)(i) (" 'Actual Loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.") *with id.* at 3.(A)(ii) (" 'Intended loss' (I) means the pecuniary harm that was intended to result . . . ."). The central issue is not what Riesterer intended, but what was reasonably foreseeable to him at the time of his relevant actions.

The Court will analyze in turn the actual loss arising from the NRI investment aspect of the fraud scheme and from the "CD monetization" scheme.

#### 1. Loss Resulting From NRI Investment Fraud

■ Riesterer's offense is determined based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by [Riesterer]" as well as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," including the conduct "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that

offense," together with "all harm that resulted from the acts and omissions specified" in the foregoing and "all harm that was the object of such acts and omissions." U.S.S.G. §§ 1B1.3(a)(1) & (3) (2011).

As set out above, the Court has found and concluded, by a preponderance of the evidence, that Riesterer was aware of and involved in the fraudulent misrepresentations made by Bussema (also working with Shuman) in the Offering Memorandum. Riesterer's own acts and omissions were therefore within the scope of, and in furtherance of, the relevant criminal activity, and Riesterer's acts and omissions also counseled, induced, and abetted the criminal acts of Bussema. *Id.*; *see also* 18 U.S.C. § 2. This is certainly true for Riesterer's conduct on and after the May 11, 2010 phone call, when his own misrepresentations and/or omissions specifically led M.D. to send an additional "investment" of $100,000. The Court therefore readily concludes that the $100,000 invested by M.D. after her call with Riesterer is within the amount of loss attributable to Riesterer for sentencing.

Further, given the findings of fact and credibility determinations set out above, the Court also concludes that the amounts "invested" by M.D., S.W., and C.B. *prior to* May 11, 2010 fall within the amount of loss attributable to Riesterer under § 2B1.1. T he preponderance of the evidence establishes that Riesterer, more likely than not, was aware of the existence of the Offering Memorandum and its terms, on or around the time he received a copy of the Memorandum in February 2010. The fraudulent solicitation of "investments" in NRI, including by use of the Memorandum, therefore falls within the scope of the jointly undertaken criminal activity for which Riesterer will be sentenced under § 1B1.3(a). His acts and/or omissions furthered the joint criminal activity and abetted the actions of Bussema and Shuman. The resulting loss to the victims of the fraud was reasonably foreseeable given Riesterer's awareness of the NRI investment fraud scheme and his tacit or explicit endorsement of the fraudulent Offering Memorandum he received in February 2010. *See United States v. Gordon,* 710 F.3d 1124, 1165 (10th Cir. 2013) (reasonably foreseeable results of co-conspirators' acts are properly tabulated for sentencing under § 2B1.1(b)).

Thus, although the evidence of Riesterer's involvement in the fraudulent scheme prior to May 11, 2010 is somewhat more circumstantial, the Court's findings above nevertheless establish that the Government has proved by a preponderance of the evidence that Riesterer's acts and omissions prior to May 11, 2010 were within the scope of and in furtherance of the jointly undertaken criminal activity. Specifically, the Court concludes that Riesterer was involved in the joint criminal activity beginning around February or March 2010, including fraudulent solicitation of funds in connection with the Offering Memorandum. Evidence supporting this conclusion includes Riesterer's receipt of the Offering Memorandum in February 2010, his failure to disclaim it after the May 11, 2010 phone call, his communications with Bussema and acceptance of substantial transfers of money from him thereafter, his acknowledged communications with Shuman regarding sale of the New Mexico plant in March 2010, and the Court's credibility assessment of Riesterer's contrary testimony. In addition, the reasonably foreseeable acts of Bussema and/or Shuman in furtherance of this joint criminal activity, and the resulting harm, are properly tabulated as loss attributable to Riesterer for sentencing.

Given the above analysis, the Court will include the $60,000 "invested" by M.D.,

S.W., and C.B. between March 26, 2010 and May 1, 2010 in its calculation of loss under U.S.S.G. §§ 1B1.3(a)(1)(B) & 2B1.1. In combination, all of the $160,000 "invested" in NRI by M.D., S.W. and C.B. between March 26, 2010 and May 13, 2010 will be included in the calculation of loss for Riesterer's sentencing pursuant to U.S.S.G. § 2B1.(b).[6]

### 2. Loss Resulting from "CD Monetization" Fraud

 As to the losses resulting from the "CD Monetization" aspect of the fraud, Riesterer has acknowledged his culpability by pleading guilty and stipulating to the facts and contentions in the plea agreement. He has stipulated that he was dishonest with his victims about his claimed travels to Europe, meetings with the Fed, purchase of an "insurance wrap" and related matters. He also failed to disclose to his victims the facts he knew about Kling, which he learned in 2009. His arguments that he was acting in "good faith" in these pursuits thus ring hollow as a factual matter. If Riesterer was himself convinced of the legitimacy of the CD monetization effort and acting in "good faith," then why did he tell so many lies to M.D., S.W., J.B., and C.B.? Moreover, even if the Court were to accept Riesterer's claim that he in good faith believed Kling, the loss to his victims was still reasonably foreseeable and is therefore included in the Court's calculation of loss under § 2B1.1. The facts and circumstances surrounding the "CD monetization" scheme made it reasonably foreseeable that any and all monies spent in pursuit of this venture would be lost.

Put another way, even if the Court were to accept that Riesterer was sincere in his efforts, it would still conclude that it was reasonably foreseeable Riesterer would never succeed in "monetizing" a one-page, poorly photo-copied document purporting to be worth half-a-billion dollars that was, on its face, issued by a bank no longer in existence, backed by an individual with no confirmed address but a reported history of criminal fraud, who purported to represent an Argentinian pension fund while also being affiliated with the Israeli Secret Police. Given these dubious facts surrounding Kling and the purported certificate of deposit, the loss of all the monies sent to Riesterer in connection with this scheme was, at the very least, reasonably foreseeable.

Riesterer also suggests that the amounts taken from M.D., S.W., and J.B. in the "CD monetization" scheme should not be calculated as loss because he treated them as "loans," wrote promissory notes for these amounts, and offered to collateralize them. But, while Riesterer at times purported to collateralize these "loans," he has presented no evidence that he ever actually provided collateral or any enforceable security. This case therefore differs significantly from mortgage fraud cases, in which the amount of actual loss calculated from fraudulently-obtained loan may be properly reduced by the value of legitimate collateral that reduced the victims' exposure and therefore the foreseeable loss. Not so here, where Riesterer not only lied to obtain the money, but provided no security to reduce the risk to his "lenders." *Cf. Crowe*, 735 F.3d at 1238 ("Fraud-

---

**6.** It is worth noting that the Court's offense level calculation under the Guidelines would remain the same even if the $60,000 "invested" prior to May 11, 2010 were excluded. Given the Court's determination below that all $219,500 sent by Riesterer's victims as part of the "CD monetization" scheme is

properly included in the calculation of loss, the total loss calculation falls within the range of $200,000–$400,000 and results in a 12-point offense level increase, with or without the initial $60,000. U.S.S.G. § 2B1.1(b)(G) (2011).

ulent misrepresentations ... cause [lenders] to assume a risk of default and ... a risk that the value of the collateral will decrease. Neither of these risks would have been assumed by the lender in the absence of fraud. Accordingly, the loss of the unpaid principal is an eminently foreseeable consequence of the fraudulent conduct"); *United States v. Morris*, 744 F.3d 1373, 1375 (9th Cir. 2014) ("actual loss is the reasonably foreseeable pecuniary harm from the fraud. This amount will almost always be the entire value of the principal of the loan, as it is reasonably foreseeable to an unqualified borrower that the entire amount of a fraudulently obtained loan may be lost").

Even more so here than in the case of an "unqualified borrower," Riesterer's use of deception to "borrow" money put the entirety of the amounts he took from the victims at risk. Even if the Court were to credit his representation that he always sincerely intended to repay his victims (although he did not begin doing so until after he knew he was facing criminal investigation), Riesterer stipulates that he lied flagrantly and repeatedly in order to obtain the money. Had he shared the true facts regarding Kling and the "CD monetization" scheme, it is highly unlikely his victims would have sent him any of the money. This is, no doubt, exactly why he lied: because he either knew the Kling transaction was a fraud or, at the very least, he knew that it was highly unlikely to pan out financially for the victims.

The Court therefore concludes that all the monies sent to Riesterer by J.B., S.W., and M.D., as part of the "CD monetization" scheme, will be included in the loss calculation, including both monies sent in response to Riesterer's 2010 claims of requiring an insurance "wrap" or bond (*see* Ex. 1, lines 8–11), and the money sent later to ostensibly support Riesterer's

claimed travel and living expenses in pursuit of the alleged $500 million certificate of deposit (*id.*, lines 12–30). The total amount of this actual loss calculation is $219,500. (*id.*, lines 8–30.)

### 3. Repayments

The fact that Riesterer began repaying his victims in March 2013 (*see* Ex. 20) does not reduce the calculation of loss. Loss may be reduced by amounts a defendant returned to a victim "*before* the offense was detected." U.S.S.G. § 2B1.1, comment 3.(E) (emphasis added). "The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.* Here, by no later than September–October 2012, Riesterer was e-mailing Bussema regarding the likelihood of a criminal investigation or prosecution, and he retained a criminal defense attorney by February 2013. (*See supra* ¶ *91*; Exs. 13–16.) Riesterer's counsel conceded at the evidentiary hearing that Riesterer knew his offense had been detected before he began any of his repayments in March 2013. These repayments therefore do not reduce the Court's calculation of loss.

### B. Restitution

██ The Government requests a total restitution award of $190,000 payable to M.D., S.W., and C.B.'s estate. This amount is equivalent to the difference between the total of $379,500 in loss and the $189,500 that Riesterer has repaid to date. ( *See* Exs. 1 & 20.) The Government argues that Riesterer should be jointly and severally liable with Bussema for $159,500 of this restitution amount, making both defendants liable for the total $160,000 taken in

the NRI investment fraud, while giving Riesterer credit for $500 in "overpayment" to S.W. (See ECF No. 172 at 9–10.)

Under 18 U.S.C. § 3663A(a), restitution is due to each of the four victims because they were "directly and proximately harmed as a result of the commission of" Riesterer's offense. Riesterer concedes that he should pay restitution, but disputes the amount.

First, Riesterer admits he must repay the $28,000 that he received from Bussema from the NRI investment scheme, but argues he is not responsible for the balance of the $160,000. (ECF No. 175 at 3; ECF No. 177 at 7.) Given the Court's conclusion above that Riesterer was jointly culpable for the full amount taken in this scheme, the Court will order restitution as to the full amount.

■ Second, Riesterer argues that he has repaid all four victims and should not be liable for amounts forgiven in settlements he reached with some of the victims. (ECF No. 177 at 7.) However, in ordering restitution, "the court must use actual loss as its metric." *United States v. Masek*, 588 F.3d 1283, 1287 (10th Cir. 2009). To the extent Riesterer has reached settlement agreements with his victims, the United States was not a party to those agreements and "The MVRA requires the sentencing court to provide restitution to victims. A private settlement cannot abrogate that language." *Id.* at 1290. Riesterer cites no authority for the proposition that restitution should be reduced by amounts the victims have agreed to forgive in separate proceedings or by private agreement. (*See* ECF No. 177 at 7.) Moreover, Riesterer has not presented competent evidence (indeed, any evidence) documenting the existence or terms of any such settlement agreements. The Court will therefore not reduce the amount of restitution on this basis.

Other than disclaiming responsibility, Riesterer also raises no argument against the Government's request that restitution ordered against Riesterer should be joint and several with Bussema's restitution obligations for the amounts taken in the NRI investment fraud. *See* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants"). Given the foregoing, the Court will order Riesterer to pay restitution in the full amount taken from each victim and not yet repaid, as detailed in the Court's Conclusions below.

## C. Other Guidelines Considerations

### 1. Obstructing or Impeding the Administration of Justice, U.S.S.G. § 3C1.1

■ "The Guidelines provide that if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" at any point during the case, the base offense level is increased by two levels. U.S.S.G. § 3C1.1. "The Commentary to this section indicates that this enhancement was intended to apply in cases where the defendant commits perjury." *United States v. Hansen*, 964 F.2d 1017, 1020 (10th Cir. 1992); U.S.S.G. § 3C1.1, comment. n. 3. & 4(B) (2011).

■ The Tenth Circuit has "held that 'denial of guilt or exercise of the constitutional right to testify in one's own defense is not a proper basis for application of Guidelines section 3C1.1.' " *Hansen*, 964 F.2d at 1020 (citing and quoting *United States v. Keys*, 899 F.2d 983, 988 (10th Cir.1990)). However, "giving perjurious testimony [is] not a protected constitutional right and [can] therefore be punished" by applying the Sentencing Guidelines enhancement for obstruction, § 3C1.1. *Han-*

*sen*, 964 F.2d at 1020; *Keys*, 899 F.2d at 988. Therefore, "[t]he court may apply this enhancement when the defendant violates the federal perjury statute, 18 U.S.C. § 1621, by giving false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Chadwick*, 554 Fed.Appx. 721, 724 (10th Cir. 2014) (citations and internal quotation marks omitted). To apply the enhancement, the court must make explicit findings as to which representations constitute perjury. *Id.*

Here, as addressed above, Riesterer's testimony before the Court was not credible. His disavowal that he never read the Offering Memorandum after receiving it in February 2010 was not believable, and his claim that he remained entirely in the dark regarding the fraudulent stock offering for his own company prior to May 2010 was inconsistent with his conduct on May 11, 2010 and thereafter. In addition, given Riesterer's knowledge of Kling's background and the facts surrounding the purported certificate of deposit, his bald explanation that the reason he lied to his victims to solicit their money was, in part, because he "believed" Kling was simply not believable.

Given the evidence before it, the Court makes the following specific findings regarding perjury:

- Riesterer was asked "[D]id you ever sign anything with Mr. Bussema?", and he answered "Never." This statement is patently inconsistent with Riesterer's June 10, 2010 e-mail to Bussema, referring to "[t]he agreement I have signed with you," and the Court also concludes this testimony was perjurious, being false, material, and willful.
- Riesterer's testimony that the "first time he had even learned about Mr. Bussema" was May 11, 2010 is inconsistent with Riesterer's conduct thereafter, when he referred to "my Reg D" and a "signed" agreement he had in communications with Bussema, never disclaimed the Offering Memorandum, and, over time, accepted some $120,000 from Bussema, beginning within weeks of this alleged first contact, following which he received some of the money originating from the fraudulent NRI stock offering. The Court therefore concludes that Riesterer's denial of any knowledge of either Bussema or the stock offering prior to May 11, 2010 was also perjurious.

In addition, as described above, Riesterer was caught gesturing to Mr. Blanco during his testimony, and made no attempt to explain how this behavior was anything other than what the Court observed it to be: a flagrant attempt to influence another witness's sworn testimony in open court. *See* U.S.S.G. § 3C1.1 comment n.4.(A).

In light of the Court's conclusions (1) that Riesterer offered perjurious testimony at the evidentiary hearing and (2) attempted to tamper with a witness at the same hearing, it is appropriate to apply U.S.S.G. § 3C1.1 to increase the base level calculation by 2 levels.

### 2. Acceptance of Responsibility

 Riesterer may qualify for a 2-level reduction if he "clearly demonstrate[d] acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). As the Court reads the Plea Agreement, the Government has not yet taken a position on application of § 3E.1.1(a) or (b). (*See* ECF No. 158 at 19–20.) However, given the extensive proceedings already held before the Court, it makes sense to resolve the issue here.

In the present circumstances the Court will not apply the offense level reduction for acceptance of responsibility. While Riesterer did plead guilty, the overarching theme of his argument on sentencing was that he was unaware and innocent of most of the factual allegations brought against him. (*See generally* ECF Nos. 175, 175–1, 177.) In his briefing and at the evidentiary hearing, he took responsibility for only a fraction of the harm caused by his crimes, and agreed to pay only a fraction of the restitution which the Court will order. Even as to amounts that he argued were always loans he was obliged to repay, he argued against ordering restitution of the full amounts, based on having privately negotiated with his victims to forgive some of this debt, which was concededly obtained by fraud. (*See* ECF No. 177 at 9.)

In the Court's view, Riesterer's positions on sentencing demonstrated an attempt to avoid responsibility, rather than accepting it. Moreover, Riesterer effectively forced the Government to put on a substantial portion of its evidentiary case. *See United States v. Villegas*, 634 Fed.Appx. 625, 632 (10th Cir. 2015) (district court was within its discretion to decline § 3E1.1(b) reduction where defendant "may have cooperated and presented little to no defense at trial," but "forced the Government to present its case"). Since Riesterer's factual contentions were tantamount to denying most of his culpability in spite of his plea agreement, the Court will not apply § 3E1.1 to reduce his Guidelines offense level for acceptance of responsibility. *See United States v. Hutchinson*, 630 Fed. Appx. 805, 808 (10th Cir. 2015) (district court properly denied § 3E1.1 reduction because defendant contested *mens rea* element of his charges).

Finally, regarding the timing of his plea, it is significant on this score that Riesterer did not enter a guilty plea until only two weeks before his trial was set to commence and more than a year after the indictment in this case. This without doubt forced the Government to prepare in a substantial way for trial. And, as previously noted, he did not begin to repay his victims until months after the FBI's investigation was underway. These facts further support the Court's conclusion that Riesterer has not clearly demonstrated the acceptance of responsibility required to warrant a Guidelines offense level reduction under § 3E1.1(a).

## IV. CONCLUSION

For the reasons set forth, the Court FINDS and ORDERS as follows:

1. The amount of loss applicable for sentencing is $379,500; accordingly the Court will apply U.S.S.G. § 2B1.1(b)(G) (2011) in calculating Riesterer's offense level;

2. The Court FINDS the amount of restitution to be ordered is as follows:

 a. $123,000 to M.D., of which $120,000 is joint and several with Bussema;

 b. $29,500 to S.W., all of which is joint and several with Bussema;

 c. $12,500 to C.B.'s Estate, $10,000 of which is joint and several with Bussema; and,

 d. $25,000 to J.B., none of which is joint and several with Bussema;

3. A reduction in the offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) is not warranted;

4. An increase in the offense level for obstructing or impeding the administration of justice is warranted pursuant to U.S.S.G. § 3C1.1;

5. A sentencing hearing is hereby SET for **May 3, 2017 at 2:00 p.m.** in

Courtroom A801. Counsel are directed to the Court's Revised Practice Standards (as most recently revised effective December 1, 2016) with regard to the deadlines for sentencing-related motions; and

6. The Probation Office shall file a Presentence Investigation Report consistent with the findings and conclusions in this Order.